EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* MARTÍN LINARES E ISMAEL ROMÁN LÓPEZ, acusados y apelantes.

*Número:* CR-67-14 *Resuelto:* 6 de diciembre de 1967

*José H. Luciano Vélez,* abogado de los apelantes; *J. F. Rodríguez Rivera, Procurador General Interino,* abogado de El Pueblo.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

Los apelantes fueron convictos de adulteración de leche. La Sec. 1 de la Ley Núm. 77 de 12 de agosto de 1925 según dicha sección fue enmendada por la Ley Núm. 77 de 17 de junio de 1955, dispone que:

"Toda persona que adulterare o diluyere leche y toda persona que así adulterada o diluida, la vendiere, ofreciere, o tuviere en venta, o que la transportare o almacenare con el fin de dedicarla al consumo humano, o con el fin de someterla al proceso de pasterización o a cualquier otro proceso en preparación para consumo humano, y toda persona que usare leche adulterada o diluida para fines industriales, cuando se destine a la preparación de alimentos para el consumo humano, será culpable de delito menos grave . . . ."

La Sec. 2 de la referida Ley de 1925 estatuye que "el grado legal de la leche deberá ser fijado por el Secretario de Salud y publicado para conocimiento general en los periódicos de mayor circulación del Estado Libre Asociado que se determinaren por dicho funcionario."

■ La Ley Núm. 77 de 1925 sustituyó la Núm. 59 de 10 de marzo de 1910. Disponía la Sec. 1 de la Ley Núm. 59 de 1910 que:

"Toda persona que adulterare o diluyere leche con la intención de ofrecerla a la venta o que causare o permitiere que se ofrezca en venta, y toda persona que la vendiere, ofreciere o tuviere en venta, será culpable del delito menos grave . . . . *La adulteración o dilución de la leche puede probarse en la forma usual que la ley provee para la vista de causas criminales, pero en cualquier caso se considerará y se tendrá por leche adulterada*

*o diluida aquélla que no diere la prueba que se prescribe por las autoridades competentes; Disponiéndose* que el grado legal (standard) de la leche deberá ser fijado por el Director de Sanidad Beneficencia y Correcciones, y publicado para conocimiento general en la Gaceta Oficial de Puerto Rico y en los periódicos de mayor circulación de la Isla que se determinaren por dicho funcionario." (Énfasis nuestro.)

Podrá observarse que la Ley de 1925 eliminó la parte anteriormente enfatizada declarando, al establecer el delito, que se consideraría adulterada la leche, o diluida, la que no diere el grado legal prescrito por las autoridades competentes.

El Reglamento Núm. 8 del Secretario de Salud de 19 de septiembre de 1957, 24 R.&R.P.R. sec. 792–1 dispone que la leche de vaca contendrá como mínimo 12% de sólidos totales y 3% de manteca de leche; como máximo 88% de agua. La Sec. 792–13 estatuye de la siguiente manera:

"Toda leche se considerará adulterada si aparece con los siguientes datos analíticos:

(1) En el suero acético:

(A) Una cantidad menor de 0.715 gramo de materia mineral por cada 100 c.c., y al mismo tiempo

(B) Una cifra menor de 39.0 de lectura en el refractómetro de inmersión a 20° C.

(2) En el suero agrio de la leche cortada natural:

(A) Una cantidad menor de 0.73 gramo de materia mineral por cada 100 c.c. y al mismo tiempo

(B) Una cifra menor de 38.3 de lectura en el refractómetro de inmersión a 20° C.

(3) (A) Una cantidad menor de las expresadas para materia mineral en el suero acético o en el suero agrio de la leche cortada natural en los incisos 1 y 2 de esta sección y al mismo tiempo

(B) Una cifra menor de 36.0 de lectura del suero cupratado en el refactómetro de inmersión a 20° C."

En *Pueblo* v. *Pérez*, 23 D.P.R. 877, resuelto el 22 de mayo de 1916, dijimos que la Ley Núm. 59 de 10 de marzo

de 1910 no estableció la manera como podía ser adulterada o diluida la leche pero que sí disponía la ley que dicha adulteración o dilución consistía en no ajustarse la leche al grado legal. Por lo tanto, la acusación no necesitaba exponer la manera específica como había sido adulterada.

En *Pueblo* v. *Rivera, et al*, 31 D.P.R. 646, resuelto en 26 de marzo de 1923, nos referimos de nuevo a la Sec. 1 de la Ley Núm. 59 de 1910. Dijimos que al determinar que la leche había sido adulterada, el químico se había referido al grado legal establecido por el Departamento de Salud y que del examen aparecía la adición de agua en proporción de un 20% por lo cual contenía 89.654% de agua cuando el grado legal permitía un máximo de 88%. Este caso de *Rivera*, al igual que el anterior de *Pérez*, aplicaron la Ley de 1910 en que, como ya se ha observado, aparecía la disposición de que se consideraría y se tendría por leche adulterada o diluida aquella que no diera la prueba prescrita por las autoridades competentes.

█ Tanto bajo la Ley de 1910 como bajo la presente Ley de 1925, se comete el delito, en la modalidad que ahora nos interesa, por el acto de adulterar o diluir la leche y así adulterada venderla, ofrecerla en venta o tenerla para la venta. La acusación en este caso imputa que los apelantes, uno el dueño de la vaquería y el otro un empleado, tenían en su posesión para el consumo humano leche que al ser examinada demostró 1.4% de grasa bajo lo especificado por la ley, o sea menos de 3%. El hecho de que el examen de la leche demostró menos de 3% de grasa no está en disputa. Pero en ausencia en la Ley de 1925 de la disposición contenida en la de 1910, que fue eliminada, al efecto de que se tendría por leche adulterada o diluida aquella que no daba la prueba prescrita por las autoridades, es preciso examinar la evidencia de cargo para ver si el delito, o sea la adulteración, fue probado como corresponde en un proceso criminal.

El oficial de saneamiento declaró que a las 9:05 A.M. del 9 de julio de 1964 tomó una muestra de leche en la vaquería propiedad del apelante Linares y la tomó de un tanque de refrigeración que contenía 1,200 litros. La defensa aceptó que la leche era para la venta a una cooperativa para ser pasterizada. Dijo el oficial de saneamiento que el envase que usó estaba limpio y *"esterilizado".* Que sacó la leche por arriba del tanque y el batidor estaba trabajando. No notó nada anormal ni en el tanque ni en la leche.

Declaró que para tomar la prueba usó un garrafón de tres o cuatro litros que le pidió prestado al empleado y apelante Ismael Román. Ese no era el utensilio utilizado por él para tomar las muestras; el que usaba lo había dejado ese mismo día en otra vaquería donde también tomó muestras de leche. El batidor del tanque era movido por un motor eléctrico. Dijo que tomó el garrafón, lo metió dentro del tanque de leche y sacó para llenar las tres botellas de muestra. Manifestó haber intervenido muchas veces con esta vaquería en el curso de cinco años que venía desempeñando el cargo en ese sector y la leche antes no había resultado adulterada. Ésta fue la primera vez que se le había extraviado el envase que utilizaba para tomar las muestras. El garrafón que le prestó el empleado lo tenían en la pluma de la pileta. Dijo que el empleado enjuagó el garrafón en unos tres tanques con agua de jabón, con clorox y agua clara. Metió el garrafón dentro del tanque y lo movió hacia arriba y hacia abajo.

Declaró el químico del Departamento de Salud que el por ciento de grasa mínimo en la leche para consumo humano es 3% y ésta dio 1.4%; que una de las formas de adulteración es adicionar agua o leche en polvo, o ambas cosas. No encontró agua en la leche adicionada artificialmente. No hicieron el análisis para determinar adición de leche en polvo. Siendo la grasa de la leche menos densa que el agua, en un continente de leche, e independientemente de la can-

tidad, la grasa siempre se va arriba, a menos que la leche esté homogenizada. El químico no pudo determinar si al tomarse la muestra la leche estaba o no homogenizada. Si la leche no estuviera homogenizada la muestra no es representativa. Si la muestra se hubiere tomado por debajo del tanque, en esas condiciones no sería representativa, por estar la grasa encima.

Repreguntado, expuso que no usó el método específico para determinar la adición de leche en polvo. Que la refracción de suero cupratado fue de 42.5, la refracción de suero acético de 48.3, siendo lo normal no menos de 39, y había 12.27 de sólidos totales.

El químico aclaró en este momento al tribunal que no informó la leche adulterada como que se le hubiera adicionado leche en polvo, sino como deficiencia de grasa.

La prueba de defensa produjo en primer lugar el testimonio del empleado apelante. Declaró que el oficial de saneamiento le había dicho que el envase de tomar la muestra se le había quedado en otro sitio; pidió un envase y el testigo le dijo que el único disponible era el de él llevar la leche a su casa. El oficial le pidió que le sacara la muestra y el testigo se dobló y la sacó por la llave debajo del tanque. El batidor no estaba funcionando debido a que el motor se había dañado y estaba siendo reparado en otro sitio. En el interín batían la leche con una paleta. Sacó la leche por debajo porque el envase estaba en el piso y creyó se podía cortar la leche. Por dentro estaba limpio, pero por fuera estaba sucio.

El próximo testimonio de defensa fue el de un perito químico, con 36 años de experiencia en análisis de leche, 10 años trabajando para Salud, 8 años en el laboratorio de la Policía, y más de 30 mil análisis de leche, 25 mil para el Departamento de Salud. Expuso que examinó la prueba y la misma no demostró leche adulterada. La refracción de suero cupratado fue de 42.5, en exceso del mínimo de 36.0. Confirmó que había 1.4% de grasa. Dijo que la leche estaba

perfectamente bien, era normal. Por los datos analíticos llegó a la conclusión que se trataba de una prueba mal tomada, no representativa.

En este caso, la prueba científica de cargo fue al efecto de que la leche no tenía adición de agua. No demostró el examen que tuviera agua sobre 88%. Reglamento—Sec. 792–1. Tenía 12.27% de sólidos, mayor del mínimo de 12%—Sec. 792–1. No se hizo examen para determinar la adición de leche en polvo, y el químico no se basó en esto para informar la adulteración, sino meramente en la baja grasa. .

La refracción de suero cupratado fue de 42.5, en exceso del mínimo de 36.0 del Reglamento—Sec. 792–13—que declara qué es leche adulterada. La refracción del suero acético fue de 48.3, por encima del mínimo de 39.0—Sec. 792–13.

La Sala sentenciadora resolvió el caso a base del aspecto limitado de la credibilidad. Sin embargo, aquí tenemos algo más que eso. Sin quitarle a la Sala su función primaria de dar crédito, una prueba científica de mayor confianza que afirmativamente no señala ningún elemento de adulteración de la Sec. 792–13 ni de la Sec. 792–1 excepto el bajo contenido de grasa, nos inclina a creer que la explicación racional de ese bajo contenido a la luz de toda la prueba, la científica inclusive, descansa en el hecho de que la prueba no fue representativa, según conclusión pericial de la defensa.

Quizás situaciones como las de este caso convencieron al Legislador en 1925 que debía eliminar del estatuto la declaración que automáticamente consideraba y tenía la leche como adulterada, esto es, el delito cometido, si la misma no daba el grado legal fijado por las autoridades.

■ Entendemos que no existe en el récord prueba legalmente suficiente que dé la medida para una convicción en procedimiento penal.

*Se revocará la sentencia y se absolverá a los acusados apelantes.*

El Juez Asociado Señor Belaval no intervino. Los Jueces Asociados Señores Blanco Lugo y Ramírez Bages concurren con el resultado.